submitted. Our next case for argument is United States v. Sandoval. Good morning. Good morning. May it please the court. My name is John Butcher. I represent the appellant Jordan Sandoval. Your honors, an absurd result cannot be a reasonable result. In this case, Mr. Sandoval's was sentenced under 2A2.2, the aggravated assault guideline. But by not killing the victim in this case, through the vehicular homicide, he turned his case into a crime of violence, which if he killed the victim, it would not have been a crime of violence. It would have been involuntary manslaughter. He raised the statutory maximum from eight years to 10 years, and that he was This cannot be a reasonable sentence, and therefore this court must reverse this sentence and send it back for the district court. The government wants to focus on the reckless conduct of Mr. Sandoval and the harm that it caused. Now, to clarify where we're beginning, are you arguing or are you not that the sentencing guidelines were properly calculated here? They're properly calculated in the sense that this is the guideline that Appendix A says should be set. And so the real argument then becomes you don't like the guidelines, the way they are promulgated. Your honor, this is a very unique situation that does not happen often. But is that your point? I mean, because you don't just, I didn't see that you disputed how calculation occurred here. That seems to track what the guidelines required. Yes, your honor. But you're saying bad guidelines. As applied to this theory of aggravated assault. I might point out Judge McKay's concurrence in Wireman, which is a case the government cited. In Wireman, Judge McKay talked about the guidelines anchor a sentencing. The district court sets the guideline range, the starting point at the outset, then the parties argue whether the facts and circumstances of the case call for a different endpoint. By contrast, challenging the guidelines themselves is more like rejecting the starting point. If applicable guidelines do not reflect a sound judgment, then it stands to reason that they should not anchor the sentencing. And because the anchoring effect of the guidelines is so strong as is intended to be, a winning policy argument would have an outsized effect on the sentencing proceedings. Judge McKay says it much more distinctly in his one paragraph than I did in my brief, that this is such a weighted part, as it should be, as such a strong anchor, that when in this case, this is contrary to the sentencing commission, contrary to Congress and mandated proportionality, that this cannot stand. I mean, this is such a strong anchoring point. Once again, everything in Appendix A that goes to 2A2.2 is a specific intent crime. Most crimes, aggravated assaults, prosecuted under 113A6, resilient serious bodily injury, are specific intent. Most of these cases come off the reservation. Most of these cases are Native American. Often we see, and most of the times we see, use of a weapon. So it's A3 and A6. A recent case, and we see these, where it's repeated domestic violence and serious bodily injury. So even if you look at the guideline source book as to cases that are specific intent to hurt somebody. In Yazi, I know it's an unpublished 10th Circuit decision, but we seem to explain that the guidelines for this purpose aren't looking at, they don't look at intent, but they are looking at injury, the severity of the injury to the victim, in terms of how they stratify the guidelines. Well, that is true in aggravated assault, but if you look at the Reasons Amendment to the aggravated assault guidelines, none of this issue was raised. Congress and the Sentencing Commission put a lot of time into the involuntary manslaughter. There was a 1997 working group, homicide or involuntary manslaughter working group, which changed the involuntary manslaughter guidelines for these sort of cases where it's a vehicular homicide. There was a 2003, 2006 Native American working group that looked at it again and decided not to change it. Congress itself changed the statutory maximum for involuntary manslaughter, I think it started from three to six to now eight years. But in this case, neither Congress or the Sentencing Commission have dealt with this theory of the offense, created guidelines for this theory of offense. And to go back to the First of all, the conduct in Yazzie was a lot more serious, and I think that colors some of the judgment. Yazzie acknowledged that they did not reject this argument. But in that case, Mr. Yazzie had multiple prior DUIs. He crashed into a minivan full of children. There was multiple victims that received serious bodily injury, and that case was significantly different than this case. And quite honestly, that case, if there had been a death, probably would have been charged a secondary murder, not as involuntary manslaughter. In this case, Mr. Sandoval does not have prior DUIs. Well, he does. They're just tribal. No, there's not. He has no prior DUIs. He has alcohol-related trials. Yes, he has an alcohol-related, although one of the alcohol-related offenses is sort of a unique reservation offense of having alcohol on the reservation. I would say that neither of those offenses would be the sort of offense that would justify a second degree murder prosecution in this case if the victim had died. They're not the same sort of knowing you've been through this before. Based on his conduct right up to the point of the accident, it might have justified it. Wasn't there evidence he was going about 104 miles per hour? He had twice the legal limit or over twice the legal limit. He had alcohol in the vehicle. He left the scene, tried to escape, essentially. Ends up getting stopped at a barbed wire fence, gets out of his car, tries to throw the cans out of his car, but still doesn't go back to the scene. There's plenty of evidence of pretty gross reckless conduct. Your Honor, that's reckless conduct. Right, it's reckless conduct. But you were suggesting that if this had, by some, you know, as a matter of fortuity, essentially, as Yazzie said, it certainly could have resulted in a death or three deaths here. So I guess I don't understand your argument that this wouldn't have been reckless enough, essentially. Well, no, no, this is reckless. That's why we pled guilty to this. I mean, under this Zuni case, he fell within aggravated assault as this court has defined it in the United States versus Zuni. The district court basically found this to be pretty extreme recklessness here, based on the circumstances of the offense itself, not so much as, you know, prior history, although it was allowed to consider that history. I would say that this is a heartland. I mean, if he's, I've yet to see like an involuntary manslaughter, that most of these factors are not part of this. I mean, twice the legal limit. I don't, I think it's very common in the cases for involuntary manslaughter. I think, you know, speeding is common. I mean, that's why we have an accident. I mean, if he was doing five miles an hour, you were not likely to have the accident necessary. I mean, that is what reckless conduct is. He actually hit her from behind, right? I mean, he was speeding at 104 miles per hour and managed to hit her from the back, I thought. I'm not sure that would... It's kind of unusual. I'm just saying it's all a matter of kind of fortuity, whether it results in a more significant injury or not. Well, that's every DUI accident, Your Honor. And if you look at New Mexico, most states have DUI aggravated assault. Or actually, in this case, they have a DUI, they have a crime for causing injury by a DUI. And I think that's where this should have been. But, Your Honor, the bottom line is that this is not what 282.2 was written about. And you argued that policy argument, correct, to the district court. And you talked about involuntary manslaughter. That discussion was had. And the district court, under the guidelines, which are not mandatory, had the opportunity to hear you and adjust the sentence accordingly. Well, Your Honor, once again, as Judge McCabe talks about, the starting point is so strong. I don't think that is sufficient. Well, not anymore. Not anymore. They're advisory. I mean, Booker's a long time ago now. Yeah, and Wireman was a 2017 case, Your Honor. The difference here is usually you have either the sentencing commission or Congress making a policy determination. For example, the child pornography guidelines was a policy determination by Congress and that was not empirically backed up by the sentencing commission. Here you have neither Congress nor the sentencing commission supporting this theory of 282.2 as being an appropriate guideline for this sort of offense. So we don't have the presumption of reasonableness because it's not like the sentencing commission looked at this and said, yes, this is, for reckless conduct, an appropriate guideline. Well, I mean, don't get me started on whether I like or dislike the guidelines, okay? Because I'm with you. But the guidelines, because that is what they are, they just create this big box. Okay, here's a general thing. We're describing this general thing. And they're never going to be specific enough to get to your case, to your facts. And that's really where I think the district court comes into play at a sentencing. But, Your Honor, here is such an unusual situation. Because he did not kill her, it turns it into a crime of violence. He cannot get voluntary surrender. He will lose possible benefits under the First Step Act. And that, to me, is an absurd result, the fact that he is worse off by not killing her than if he had killed her with the same reckless conduct. That, as we indicated in Lenti, that could mean that the problem is that the sentencing guidelines, if he killed her, are too low. Not necessarily that these guidelines are too high. Well, Your Honor. I mean, you're arguing there's not a big enough difference. And what that means is the problem could be on either side of the equation. Your Honor, I would especially, sorry, disagree with that. Because Congress has looked at this, has raised the statutory maximum for involuntary manslaughter. That led to the 1997 Working Group of the Sentencing Commission. So when they created the new guidelines, they rejected higher, some districts, including the District of New Mexico, recommended a higher guideline. That was rejected. The commission then looked at it again. And it was brought to the commission's attention again on the Native American Working Group in 2003 or 2006. We cited that thing. So the Sentencing Commission has looked at the involuntary manslaughter multiple times over the last couple of decades. Congress has looked at this multiple times for involuntary manslaughter over the last couple of decades. And this is their policy determination. So the idea that where we have all this documentation and all this effort going into the involuntary manslaughter, and we have silence under the Zuni theory of aggravated assault, it just cannot be said that these guidelines are too low. This is the policy determination that has been made after a lot of study on multiple occasions by the Sentencing Commission and Congress. May I reserve the rest of my time, Your Honor? Sure, yes.  Good morning. May it please the Court. My name is Nicholas Ganji for the United States. This issue before the court is whether the defendant's 27-month sentence, which is the low end of the applicable guideline range, is substantively reasonable. But it is also important to note what issues are not before the court. And as the court touched upon a few minutes ago, what is not at issue is the procedural reasonableness of the sentence. And also what is not at issue is any of the factual findings of the district court that underlie the 27-month sentence that it imposed. So the only question before the court now is whether the district court properly exercised its broad discretion in sentencing the defendant to a low-end guideline sentence. And because it was within the guidelines, it is deemed to be presumptively reasonable. And as such, the sentence should not be disturbed unless it is arbitrary, capricious, whimsical, or manifestly unreasonable. Now, as this court— Could I ask you a question, maybe a little off-brief here? But why do we have this presumption of reasonableness now when the guidelines are no longer mandatory? Your Honor, that's an interesting question. I mean, this sort of feeds into what your opposing counsel is saying. And that is that these guidelines, you know, set the frame. And they're a firm beginning. And it's significant that we have this guideline, because that's our starting point. Yes, Your Honor. And that's an interesting question. Because the very term reasonable, it connotes the idea that there are different conclusions that people are going to draw. And the question is whether those conclusions are within the same universe or the same ballpark as one another. So to have guidelines is a step forward away from indeterminate sentencing, where one judge may sentence someone to an incredibly draconian sentence, and one may— You know what? That's still happening. Your Honor, I think the guidelines are at least an attempt to reduce— I know that was the idea. That's why they were promulgated to begin with, was the variation in sentencing. So— Should the presumption of reasonableness be flexible depending upon how that particular guideline was adopted? Your Honor, I think that that would actually present more problems than it would solve. It would add a whole new axis to what guidelines are presumptively more solid and can be relied upon than others. I mean, that's what we do. I mean, we look behind things. We consider whether rational decisions were made. I mean, it doesn't sound like it would be too much burden. Well, I think that's an interesting point because the defendant has that burden here of saying, well, what are the rationales with the district court erred in considering the 3553 factors? So Weyermann says that even if he shows that this guideline is fundamentally flawed or lacks an empirical basis, he still needs to overcome this presumption of reasonableness. Yeah, and that's a big word, isn't it? That presumption. That's a big thing in criminal law. Yes. Presumption. Why are you entitled to a presumption? Well, the presumption— When the guidelines are advisory, it's just sort of like, here's an idea, and maybe it'll fit your fact pattern. I mean, we have an unusual situation here. Do you not agree? Well, again, it's unusual in the sense that the facts in this particular case shake out, but not in sort of a global sense that a defendant would have you believe. Aggravated assault begins with the lowest form of mens rea being recklessness. Involuntary manslaughter begins with that being criminal negligence, a lower standard of mens rea. So, of course, those numbers are going to be higher on the lowest end of aggravated assault than they are involuntary manslaughter. And in terms of the permanent injury enhancement, this court would have to look no further than Zuni to see a situation where it is about the next closest step to death, where you had a victim who cannot sit up, cannot swallow water or food, lost control of their bowels and bladder. That person, yes, that person is not dead, but that is, I think, a guideline range that is appropriately close to involuntary manslaughter to justify that. So the difference between the two is not a dramatic difference, and justifiably so. So going back to the defendant's burden here in terms of the 3553 factors, under Crystal, he has to articulate why did the district court fail to consider or why the 3553 factors don't support this sentence. And in looking at this, both the opening brief and the reply brief, there is only three scant mentions of the 3553 factors of how they apply to his client. Indeed, the only thing that defendant really relies on is this sort of proportionality argument. It goes all in on proportionality. So on page 12 of the opening brief, there's a discussion as the history and characteristics of the defendant. The district court actually addressed that almost verbatim saying, 27 months based on the history and characteristics of the defendant. And I think it's page, I think, 18 of volume three. And it's interesting to note the district court did that in the context of not only denying the departure that defendant was asking for, but denying the upward departure the government was asking for. The only other two mentions of the factors are rather circular, not very helpful, where the defendant simply says, because these guidelines are disproportional, it won't promote respect for the law. And it will result in sentencing disparities without any further elaboration. So just the most perfunctory addressing of the 3553 factors, which is an obligation that the defendant must do in order to overturn the sentence. So unless the court has any particular questions for me, I'll see the rest of my time. Seeing none, thank you. Thank you, Your Honors. Your Honor, the government makes light of proportionality. Proportionality and uniformity were the two mandates in creating the sentencing guidelines. Here, a non-proportional sentence violates both the directives of the Sentencing Commission and the mandate of Congress. So this is a very important factor when you have a sentence that does violate proportionality, as this sentence does. As to the aggravated assault, it does not start with this low-level conduct. Aggravated assault starts with specific intent conduct. It was only later in 2006 when this court decided, Zuni, did it add in this reckless standard that was not there before. As to criminal negligence, the guidelines, the Sentencing Commission chose not to make criminal negligence or recklessness a sentencing factor. Once again, this was something that was looked at in detail in the 1997 manslaughter working group, and it chose not to do that. So what we have is a one-guideline difference between the loss of a pinky and death. Both would be based upon reckless conduct, and that is a disproportional sentence and it's an unreasonable sentence. Once again, Congress has spent a lot of time working on the involuntary manslaughter guidelines as it applies to vehicular homicide as the Sentencing Commission. They have not, I mean, probably should write its own crime for this, but have not done so. 2A2.2 is the wrong anchor to start with, and that anchor should not be entitled to a presumption of reasonableness because neither the Sentencing Commission nor Congress came to this conclusion that this is where this should be. This was something that was a result of Zuni. The Sentencing Commission never took it back up again. There's just not enough cases for the Commission probably to ever bring it up. But Zuni is not the only case in the country that follows the recklessness category. I mean, there are other cases that say recklessness satisfies this guideline. That's true, Your Honor. But once again, the Commission has never addressed those cases. And the Commission writes a lot why it does things. I mean, you have all the reason amendments to 2A2.2. The government does not dispute that those go to this issue. I'm seeing I'm out of my time unless the Court has any further questions. We're fine with that, it looks like. Thank you. Thank you, Your Honor. Thank you. Thank you both for your arguments this morning. The case is submitted.